## HUBBELL *vs.* McCULLOCH.

The mistaken act of a party, done in ignorance of his rights, even though acquiesced in by a party benefited thereby, who was acting in equal ignorance, can not be deemed a *practical location* of the boundary line between them.

The doctrine of practical location was originally derived from a long acquiescence by the parties in a line known and understood between them, for such a period of time as to be identical with "time immemorial," or "time out of memory."

Practical location of a boundary line, to be effectual, must be an act of the parties, either express or implied; and it must be mutual, so that both parties are equally affected by it.

It must be definitely and equally known, understood and settled. If unknown, uncertain or disputed, it can not be a line practically located.

The plaintiff was originally the owner of a lot containing four hundred and twenty acres of land. After having conveyed one hundred and five acres thereof to D., one hundred and five acres to W., and another one hundred and five acres to the defendant, adjoining the portion remaining unsold, he alone and at his own expense, caused a surveyor to measure off another lot of one hundred and five acres, adjoining W.'s lot, and to fix the corners and run a straight line through, between the monuments, assuming that such line was the middle line of the original four hundred and twenty acre lot. *Held* that this *exparte act*, of itself, constituted no settlement of a line between the parties, by which the defendant was bound.

After the defendant had received his conveyance, the plaintiff told him that he was going to survey the lot, and wanted him to accompany the plaintiff. The defendant declined, saying, "You go out and survey the line between you and me, and wherever you say it is, I will abide by it." *Held* that this previous promise to agree, or to let the plaintiff fix the line, was not equivalent to the exercise of a judgment, or a concurrence of minds, at the time, and would not constitute a binding contract or settlement; certainly not if the line was run upon lands covered by the defendant's deed.

Subsequently to the running of this line, the plaintiff informed the defendant how the line had been run, and described the corners; but there was no proof that the defendant assented to the line as run, or that it was fixed or adopted betwen the parties. *Held* that the silence of the defendant, while ignorant of the locality, would not constitute a line of practical location; especially against the evidence of two witnesses that the defendant never knew where the line was. And that this failed of settling upon a line, and therefore was not a *practical location*.

Where land is unimproved and uncultivated, the mere running of a line through the woods, exparte, by one of the owners, so long as such line is not settled upon and mutually adopted by the adjoining owners, as a division line, is an immaterial fact.

---

Hubbell *v.* McCulloch.

---

An owner can claim no benefit from such a line, as a fixed division line, until he shows his assent to it, or his adoption of it as a line.

The description, in a deed, of the premises conveyed, can not be controlled by parol evidence of *acquiescence* in another boundary; unless such an adverse possession be shown as is, in itself, a bar to an ejectment. Exercising acts of ownership, by cutting logs, and fire wood, on uncultivated and uninclosed wood and timber lands, for a period of seventeen years, is not sufficient.

THIS action was brought to recover for a quantity of saw logs cut by the defendant upon a tract of land in Chazy, Clinton county. The lot in question is part of lot No. 4 of what is called the "Refugee tract of 420 acre lots;" and the trial involves the question of title to the *locus in quo.*(*a*)

The plaintiff himself, is the source of title—obtained 27th July, 1839. The tract is nearly in a square form. The plaintiff first sold to one Dunn, *one hundred and five* acres, which was then *supposed* to be the easterly one quarter. He then sold to one Wilson one hundred and five acres, supposed to be the westerly one quarter. Then by deed, dated 12th September, 1839, he sold to the defendant one hundred and five acres, adjoining the easterly quarter, which had been sold to Dunn; Wilson's lot was described as follows: "All that certain piece or parcel of land situate in the town of Chazy, aforesaid, *and being one hundred and five acres of land,* in

(*a*) Map of the *locus in quo.*

NORTH.

SOUTH.

lot number four (4) of the large lots, Refugee Patent, and
to be taken west, and adjoining the east one hundred and five
acres of the same lot, by lines north and south, parallel with
the east line of said lot number four." Upon a subsequent
survey of the whole lot, it overran in measurement forty-four
acres, one rood and thirty-five rods. Giving to each pur-
chaser his exact measurement, would leave the plaintiff about
one hundred and fifty acres of land. The lines of the lots north
and south were never run by an accurate survey and meas-
urement. The north and south lines were well known and
understood, and the east and west lines of the whole four
hundred and twenty acre tract, so called, were well ascer-
tained. In the fall of 1839 the plaintiff got a surveyor by
the name of McCollum, to run off the westerly lot of one
hundred and five acres of No. 4, for Allen Wilson, the pur-
chaser thereof. This was run, and the corners thereof fixed
on the north and south lines of the tract. The plaintiff then
directed the surveyor to measure off, running easterly, one
hundred and five acres more, which was done, fixing the
easterly corners on the north and south lines of the tract ; a
hemlock tree being the southeasterly corner, and a cedar
stake being the northeasterly corner, and a straight line
running through the tract from these two last named corners,
being what is known as the "McCollum line," and which
was then supposed to be the center line of the four hundred
and twenty acre tract. Had the whole tract contained just
four hundred and twenty acres, this McCollum line would
have been about the center ; but, measuring off two .one
hundred and five acre lots, beginning on the east side of the
tract, would make another line about nine chains and sev-
enty-eight links easterly at the south end of the tract, and
about three chains at the northerly end of the tract, leaving,
as above stated, about forty-four and a half acres of surplus
lands between these two lines. Upon this surplus parcel of
land is the *locus in quo.* In the fall of 1839, when the
plaintiff procured McCollum to make the survey of Wilson's

lot, he informed the defendant that he was going to survey, and said to him, "I am going to show you your west line. You are bounded on the south and north by the lot lines, and on the east by Dunn's line." The defendant said: "You go out and survey the lines between you and I, and wherever 'you say it is, I will abide by it." "A few weeks after he told me he had made the line between him and me, and told me where the corners were, and described them; he said the south end of the line was a tree marked on four sides; that the north was a cedar stake; that the line was marked clear through, and said he had surveyed one hundred and five acres for Wilson, and one hundred and five for himself, and fixed a line between him and me, so that we should not get over." At the time of this survey, the plaintiff did not know that there was a surplus of land. The defendant's deed does not cover this forty-four acres, one rood and thirty-five rods of land. The surplus is uncultivated and uninclosed wood and timber lands. The logs in question were cut on this surplus, and the defendant had cut timber, and logs and fire wood, from ten to seventeen years, up to the McCollum line. The plaintiff had the several lots run out in February, 1860. He first knew it overrun in 1848, and told the defendant so. The defendant said he did not know where the line was, and did not care. The plaintiff never forbade cutting on this lot till the winter of 1860. The remaining facts will appear in the opinion of the court.

*G. M. Beckwith*, for the plaintiff.

*J. Averill*, for the defendant.

*By the Court*, POTTER, J. When the testimony on the trial of this action was closed, there were certain undisputed facts in the case, or facts which must be assumed to be uncontroverted. These uncontroverted facts are, 1st. That the lands in question are part of lot number four of the

large lots in "the Canadian and Nova Scotia Refugee tract," in the town of Chazy, in the county of Clinton. 2d. That the exterior lines of the whole lot number four, were distinctly known, recognized and agreed to, by the parties to the action. 3d. That the plaintiff's paper title covered the *locus in quo.* 4th. That the defendant's deed did not include the premises upon which the wood was cut; and 5th. That the premises upon which the wood was cut, are uninclosed, uncultivated wood land. I do not find any conflict of evidence in relation to these five propositions of fact; none was claimed or pretended by either party. They clearly appear, and I think, therefore, we may, in our review, assume them to be conceded facts. And in the view I have taken of the questions to be decided, I deem them, and every of them, to be material facts in the case. The fourth fact that was submitted to, and specially found by the jury, to wit, "That the original lot number four contained a surplus of land over four hundred and twenty acres," was just as clear, undisputed and uncontroverted on the trial, as those we have above assumed. There was no necessity, though it did no harm, that this fact was found by the jury. I select this fact from the others found by the jury, because I regard it as the only fact found by them that was important to a proper decision of this case. The parties admitted the value of the wood in question to be $60.

At the close of the case, the plaintiff's counsel requested the court to instruct the jury, that the plaintiff was entitled to a verdict for the amount of the wood taken by the defendant from the land lying between the McCollum line and the Robbins line. The Robbins line being supposed to be the defendant's west line, according to his deed. The court declined so to instruct the jury, and the plaintiff excepted thereto. To understand the legal force and effect of this ruling, it must be understood, that the quantity of land lying between the McCollum line and the Robbins line was the undisputed surplus land contained in *great lot number*

four, after taking out four lots of one hundred and five acres each, and all this surplus, except about six acres, was unimproved and uninclosed wood land. That this six acres was inclosed with either brush or log fence, and had been used and cultivated by the defendant, from the date of his deed in 1839, and had been so used by him previously, while occupying it under a contract to purchase a portion of this tract number four.

Starting with this state of facts before us, it is clear that the fee of the lands between the McCollum line and the Robbins line, is in the plaintiff, and that it is not included within the description, nor covered by the deed of the defendant. And if the plaintiff has lost his right to it, or is barred of his action to recover for injuries to it, it is by reason of his assent to a location, express or implied, or to an acquiescence in an established line between him and the defendant, for such a period of years that the law will not permit it now to be disturbed. It is not claimed that the defendant has acquired the title to the *locus in quo*, by any grant, assignment, surrender or declaration thereof, by deed or conveyance reduced to writing; nor that any consideration has been paid by him therefor, in accordance with the provisions of the statute of frauds. The plaintiff, on the trial, having established the legal title or fee in the property to be in himself, has another statute provision coming to his relief, to wit, " that he shall be *presumed* to have been possessed thereof within the time required by law; and that occupation of such premises by any other person, shall be deemed to have been under and in subordination to the legal title, unless it appear that such premises have been held and possessed adversely to such legal title, for twenty years before the commencement of such action." (*Code*, § 81.)

As it is not claimed that the defendant's possession or claim of title is founded on a written instrument, *adverse possession* can only be set up, and the land deemed to be adversely possessed, in the following cases: 1st. Where it

Hubbell *v.* McCulloch.

has been protected by a substantial enclosure. 2d. Where it has been usually cultivated or improved. (*Code*, § 85.) Neither of these conditions was proved in favor of the defendant, on the trial. The defendant then comes into court with the disadvantages of having neither the title by deed, nor of having possessed the property adversely, according to the statute definition of adverse possession. All this the learned judge, on the trial, held, and so correctly declared in his opinion.

But the defendant still claims that there has been a "*practical location*" of the boundary line between him and the plaintiff, acquiesced in for over twenty years; and that such acquiescence precludes the plaintiff from disputing the correctness of such boundary. This is now, as it was before the learned judge who tried the cause, the only question to be examined. In the view I have taken, I have found myself unable to concur in the opinion expressed on the trial. I have supposed that ever since the decision of *Adams* v. *Rockwell*, in the Court of Errors, reported in 16 *Wend.* 285, there had been a uniform current of authority from the courts, confirming the doctrine there enunciated, only varied and explained according to the varying circumstances of subsequent cases, as to points in which they differ, and I am unable, in my review of any modern case, to find the general rule, as laid down in *Adams* v. *Rockwell*, to be overruled or shaken. But before we proceed to review the cases which are supposed to have varied this doctrine, let us look, for a moment, at what is assumed in this case to be "practical location," a thing of such potency in its effect upon the statutes. How, and by whom, was such practical location made, and under what circumstances? 1st. The McCollum line was run by the plaintiff alone, without the presence and approbation, at the time, of the defendent, and in ignorance, by the plaintiff, of the fact that there was a surplus of land in the tract. This is also a clear and undisputed fact in the case. 2d. The defendant, when told, a few weeks afterwards,

how it was run; first, that one hundred and five acres had been run off to Wilson, a purchaser, from the westerly side of the large lot, 4; and then one hundred and five acres more had been run out to the plaintiff, next and adjoining to Wilson, and that the easterly line of the plaintiff's one hundred and five acres, was the line run through, (called the McCollum line,) the defendant, by no act or language, either accepted, or refused to accept of this line; and if accepted, it must be inferred from silence, or from subsequent acquiescence and action.    3d. There was no *dispute* or doubt, in fact, existing between the plaintiff and the defendant, to settle or be settled, in regard to the place of the true boundary line between them.    4th. There was not even uncertainty, as to the precise westerly line of the defendant's lot; the northern, southern and eastern lines of the large lot being definite, fixed and known; and there was no conflict in the case, between monuments and distances.    The eastern line was as certain as a mathematical problem; it had only to be measured.    In contemplation of law it was known "*id certum est quod certum reddi potest.*"    5th. No consideration, actual or ideal, was given or yielded, or assumed to be given or yielded, on either side, for the settlement of the line.    6th. The defendant made no valuable or other improvements, and incurred no expense on his part, by reason of the running or settling, or of acquiescing in, this McCollum line.    How, then, is the running of such a line, under such circumstances, a "practical location?"    It appears to me to be a misnomer — a misapplication of legal terms — to make the mistaken act of a party, done in ignorance of his own rights, even though acquiesced in by a party benefited thereby, who was acting in equal ignorance, a "*practical location.*"    Such acts do not at all express the idea of practical location, as drawn from the cases in the books.    There has been, in the early cases, a good deal of confounding of possessions that began adversely with this new method of getting round the statute of frauds, now

Hubbell *v.* McCulloch.

called "*practical location;*" but it is time that possessions began adversely, and possessions claimed to have begun under practical location, if there is any difference, should be in some way distinguished. At this day, the statute sufficiently defines how title may be acquired by an adverse possession. The learned judge who tried this action, correctly held that rule, and he correctly held that in this case there was no adverse possession. Practical location is not a term known in legal lexicons. It is a modern coin, and if it has so potent a power and meaning, that it can deprive one of his estate, it is a dangerous power to be permitted to run at large ; and the aid of legislative or judicial authorities should be evoked to limit its power of evil. In searching for its origin, and introduction into the cases reported, we find it originally derived from a long acquiescence by the parties, in a line known and understood between them, for such a period of time, as to be identical with "time immemorial," or "time out of memory ;" and like the rule in easements, of title by prescription, rather than disturb such an ancient line, it was the policy of the law, that it was better to presume a grant than to incur litigation dependent upon the infirmity of memory or loss of muniments of title, at a period so far removed from the date of its settlement. One of the earliest cases upon which practical location is claimed to be traced, was a possession of thirty-six years, (*Jackson* v. *Bowen,* 1. *Caines,* 358,) where Thompson, J. said the parties had used them during that period *adversely* to any other claim, and recognized them by acts of use, and declarations, during all that time ; that this was sufficient to protect the possession against the action. The difference between that and this case is, that here there has been no *adverse* holding. And Judge Thompson referred to and recognized this very distinction; for, said he: "A man may be mistaken with respect to his title, and perhaps ought not to be concluded by his confession, if made under circumstances inducing a suspicion of imposition or ignorance ;" but, said he, "neither

of these appear." The next case is *Jackson* v. *Dysling*, (2 *Caines*, 197.) In this case there had not only been an acknowledged possession of forty years, but the line had been fixed by an *express* agreement between the parties; and their joint employment of a surveyor to run the line, and who did run it; and possession was taken according to the line so run. Some fourteen years prior to the action, the owners, doubting the correctness of the line, agreed by parol to submit to two surveyors to fix the true line, who found the former line to be erroneous, but the parties never carried out their agreement by actually changing the line, and the action was to recover according to the line so last run. Thompson, J. said, in this case, in reference to the last line: "I can not consider this agreement as extending to the title of the land, or to have the operation of a conveyance." And Livingston, J. in the same case, said: "The defendant's possession was *adverse* to the lessor's claim, not only, but commenced with his ancestor's consent." Here, too, was an adverse holding.

The case of *Jackson* v. *Vedder*, (3 *John.* 8,) was a question between monuments and actual location, and posession by all the parties for forty years, on the one side, and a survey showing an error in the monuments, on the other side. The court said " that the proprietors having made a survey, and taken possession and held for forty years, ought to be concluded from contesting, with each other, the correctness of the *actual locations.* This term, *actual locations,* is identical with *practical location*, subsequently adopted, including adverse holdings. In *Jackson* v. *Dieffendorf*, (*Id.* 269,) Judge Van Ness said: "A location made in 1765, and probably in exact conformity to a survey made on partition in 1744, and quietly suffered to be continued by the proprietors of the adjoining lot until 1803, is, and ought to be, final and conclusive. This *evidence* of right should be taken to be conclusive." Here, it is seen, the case is put on the *evidence* of right. Following this, is the case of *Jackson* v. *McCall*, (10 *John.* 377,) which was also settled upon the question of

*evidence.* It was held that parol declarations and confessions of a person in possession of land, as to the true boundary line between him and the land of another, are admissible evidence, and that the occupants on both sides, and the plaintiff himself, by his act of building a stone wall on that line, and the parties having held and occupied and recognized that as the true line forty-one years, ought not now to be disturbed. These several cases were put either upon the question of evidence arising from long possession, or upon the combined evidence and adverse holding, according to the doctrine of the common law, and long possession, from which, from its length of time, a conveyance will be presumed.

These cases were all reviewed in the Court of Appeals, in *Baldwin* v. *Brown*, (16 *N. Y. Rep.* 359,) by Selden, J. and cited with approbation, as cases of *"practical location,"* although those terms do not occur therein, except as *actual location*, which is really identical in meaning. As I understand the case of *Baldwin* v. *Brown*, it lays down the rule exactly the opposite of that of this case, at the circuit. I adopt *Baldwin* v. *Brown*, as I understand it, as conclusive of the case before us. Now, let us see how exactly that case follows the reasons for the decisions made in the cases above cited. That case was to recover a strip of land, six rods wide, lying between the farms of the parties, who derived title from the same source. The surveyor who originally ran this line between the parties, made a mistake of one chain against the grantor of the plaintiff, which mistake made the exact quantity of land in controversy. After the survey, and in 1808 or 1809, the parties built a division fence on this erroneous line, and they, and their respective grantees, occupied and cultivated the land up to this fence, each claiming to own up to the fence till, 1852, a period of forty-one or forty-two years. This division fence, had, by consent of the parties, been moved from time to time, in portions, for the purpose of enabling the parties to clean up the hedges,

until it became zig zag. In 1852 the parties employed a surveyor to run and straighten the line, so that they could build the fence on the true line. In pursuance of this agreement, the surveyor ran the line, and then first discovered that the plaintiff's premises fell short just one chain of the distance given him in his deed. The plaintiff then demanded of the defendant the possession of this strip, and the action was brought to recover it, on his refusal. The defendant had judgment, and it was affirmed at general term. Here was *practical location, adverse possession,* and forty years quiet acquiescence. Now, upon what ground do the Court of Appeals place the decision? They say: "The plaintiff is precluded, upon principles of public policy, from setting up or insisting upon a line in opposition to one that has been steadily adhered to, upon both sides, for more than forty years." "If necessary, in order to establish this line, the law will presume a conveyance in accordance with it," and they do not consider it necessary to discuss the question of adverse possession. In the same case they say: "Unless the acquiescence has continued for a sufficient length of time to become thus conclusive, it is of no importance." They also hold that the agreement between the parties is not the foundation of the rule.

"It seems impossible," (say the court,) "to hold that a mere parol agreement, adopting a line different from that described in the deed, is obligatory, without violating the statute of frauds, both in its letter and spirit." "In all cases in which practical locations have been confirmed, upon evidence of this kind, the acquiescence has been continued for a long period; rarely less than twenty years." "There may be cases in which an express agreement, recognizing an erroneous boundary line, will conclude a party; as where the other, acting upon the faith of such agreement, has made expensive improvements, the benefit of which will be lost to him if the line be disturbed." "Such cases, if they exist at all, rest upon a different principle, viz: *that of estoppel in*

Hubbell *v.* McCulloch.

*pais."* The case before us does not at all rest upon the principle of "*estoppel in pais,*" nor of an adverse holding. It can only be claimed to rest upon "practical location, evidenced only by *long acquiescence ;*" acquiescence so long, that it may go to the jury, not only as evidence of an original parol agreement, but for a direct legal inference as to the true boundary line. We will then examine the case, to see if it can be supported, alone, upon this view. There is nothing in the case of *Hunt* v. *Johnson,* (19 *N. Y. Rep.* 279,) that I can perceive, at all changing the rule as applicable to this case. And there is nothing in any decided case, that I am aware of, overruling the doctrine on this subject in *Adams* v. *Rockwell,* but on the contrary, it is reaffirmed in very recent cases, and as I understand it, distinctly, in both cases cited by the learned judge in his opinion.

Now, to my mind, the case before us presents neither an act of practical location, nor evidence of long acquiescence; and it must do both, according to *Baldwin* v. *Brown,* before this supposed power of acquiescence can be rendered sufficiently effective to override the statute of frauds. Practical location must be an act of the parties, either express or implied; and it must be mutual, so that both parties are equally affected by it. It must be definitely and equally known, understood and settled. If unknown, uncertain, or disputed, it can not be a line practically located. The evidence in this case is undisputed, that the parties did not jointly, or at joint expense, or by a concurrence of minds necessary to constitute a valid settlement, make a line ; but the plaintiff alone, at his own expense, and by his sole direction, after having measured off to Wilson one hundred and five acres on the west side, to correspond with his purchase, ordered the surveyor to measure off another lot of one hundred and five acres adjoining, and fix the corners and run a straight line through, between these monuments. And this was done. In ignorance of a surplus of land, the plaintiff, as a logical conclusion, or as a solution of a mathematical

proposition, that two quarters were equal to a half, assumed that this line was the middle line of the lot of four hundred and twenty acres. This exparte act, of itself, constituted no settlement of a line between the parties, by which the defendant was bound. Had this line been run upon land covered by his deed, would the defendant have been bound? True, the defendant swears that in November, 1839, but after he had his deed, the plaintiff told him that he was going to survey that lot, and wanted him to go, which he declined; and he said to the plaintiff, "you go out and survey the lines between you and I, and wherever you say it is, I will abide by it." This previous promise to agree, or to let the plaintiff act as umpire between them in fixing a line, is not equivalent to the exercise of a judgment, or a concurrence of minds at the time, and would not constitute a binding contract or settlement; certainly not, if run upon lands covered by his deed. True, the defendant also swears, that a few weeks subsequent to running this line, the plaintiff informed him how this line had been run, and described the corners; but he omits to say he assented to the line — of which he was so informed — or that it was fixed or adopted between them. And surely this silence, while ignorant of the locality, would not constitute a line of practical location, especially against the evidence of two witnesses, uncontradicted, that the defendant never knew where this line was. This surely fails of settling upon a line, and therefore fails of being a "practical location." How then is the question of acquiescence? Acquiescence in what? Can a party acquiesce in the correctness of a line, so long as he does not know where the line is? Let us look at this question, and see what kind of acquiescence we find in the case. There was no mutual acquiescence at the time the line was run, as we have seen. The plaintiff, exparte, ran a line, and made marks, and at the time supposed it to be the true line; in this he was mistaken; that is clear. So long as he remained in ignorance, *he* had no reason to question its being in the right place. It was

through uncultivated, unimproved wood land; and so long as it remained uncultivated on both sides, the mere running a line through the unoccupied woods, was an immaterial fact. So long as it was not settled upon ; so long as it was not mutually adopted as a division line, it was immaterial. What, then—until evidence of its being adopted as a line—was, or could be, acquiesced in ?　On the part of the plaintiff, until it was adopted as a division line, it amounted to a mere expression of his individual opinion of the line between them. The defendant can claim no benefit from it as a fixed division line, until he shows *his* assent to it, or his adoption of it as a line.　When did he do this ?　Never, by any express understanding ; not even by a knowledge of its precise locality.　If he ever adopted it, it was by action, in entering upon, by cutting timber in its vicinity, and occupying ; and the extent of his occupation would be exceedingly difficult to determine, inasmuch as we are bound to believe, from the undisputed evidence, that he never knew where the line was.　I apprehend it is clear, that if the plaintiff had run, and believed in the accuracy of this line, through uncultivated woods, for a period of fifty years, unless the defendant had also recognized, adopted it, and occupied up to it, it would have remained an exparte expression of an erroneous opinion of the plaintiff, and nothing more.　He might not be able to rub out or obliterate his marks, but it would not estop or bind him upon a question of title.　But suppose that we may imply acquiescence on the part of the defendant, from his acts ; and I propose to examine his rights upon that theory.　When, in such case—from what date—may his acquiescence be implied ?　I think we shall do him no injustice if we adopt the first act of the defendant, tending to prove such implication, (not of the recognition of the *line* which he did not know,) but the first act of occupancy of the disputed premises. Allow the defendant to be his own witness on the subject, and there is no other witness who goes so far back as himself. He says : "I sold logs to Scott, thirteen years ago last winter ;

to Wilson,· ten years ago last winter; cut fire wood on disputed land for the last fifteen years. I think I sold to North, seventeen years ago." These are *all* the acts of occupancy of the defendant, not only, but they reach back farther, in period of time, than is shown by any other witness. By no stretch of legitimate construction of the evidence in the case, can the defendant claim to have recognized or *acquiesced* in this line, as a division line, for a longer period than he has exercised acts of occupancy, to wit, seventeen years. As was said by Selden, J. in *Baldwin* v. *Brown,* upon such testimony, and "upon this theory, a deed may be made to convey land not at all described in it, by means of a mere parol agreement, adopting boundaries entirely different from those mentioned in the deed." There is not even one dictum to be found in the books sustaining so weak a case. Following the case of *Adams* v. *Rockwell,* came the case of *Clark* v. *Wethey,* (19 *Wend.* 320.) Judge Cowen, referring to *Adams* v. *Rockwell,* as a review of all the cases, down to that time, and examining the whole doctrine as to conveyance of lands by parol, through the medium of boundaries contrary to the terms of the deed, came to this conclusion; "that upon principle, where the description in the deed designates a piece of land as that conveyed, the description can not be departed from by parol evidence of intent, or acquiescence in another boundary, unless such an adverse possession be shown, as is in itself a bar to an ejectment." Unless this legal proposition has been overruled, the case before us has been erroneously decided. The case of *Clark* v. *Baird,* (5 *Seld.* 183,) which was a case of claim of title by acquiescence, also, Justice Johnson, who delivered the opinion of the court, quotes the above cited proposition as law; and referring to the opinion of Judge Cowen, says: "I think his argument fully sustains him." *Clark* v. *Wethey* was in its features much like this; an action "*quare clausum fregit,*" and possession taken according to the boundaries upon one of the

lines, as pointed out by the grantor, but not in accordance with the deed.

At the trial, the judge charged the jury, "that if they were satisfied that the line of marked trees was made at the time of the survey, and that when the deed to Ephraim Wethey was executed, such line was established by the parties, at the time of the execution of the deed, as the boundary between them; that possession was taken accordingly; that the plaintiff had acquiesced in that line as the boundary, and the defendant and his ancestor had made improvements to the line, with the knowledge and acquiescence of the plaintiff, the defendant had made a good defense." The possession, in that case, was short of twenty-five years, (commencing before the Revised Statutes.) The jury found for the defendant. The Supreme Court reversed the judgment, and said : " Taking the title to the defendant's farm to cover no more than what is confessedly included in the written boundaries, in the deed given by the plaintiff to Ephraim Wethey, and under which the defendant claims there can be no dispute, that his defense is an utter failure." " That deed goes round the farm by specific courses and distances, and if these be followed, the deed clearly comes short of the *locus in quo.* It belongs to the plaintiff." So, too, down to the case of *Terry* v. *Chandler,* (16 *N. Y. Rep.* 357, 358,) the rules laid down in *Adams* v. *Rockwell, Clark* v. *Wethey,* and *Clark* v. *Baird,* (5 *Seld. supra,*) are again cited with approbation, and the rule repeated, that no acquiescence will be sufficient, unless such adverse possession be shown as is, in itself, a bar to an ejectment. In the case before us, there has been no adverse possession whatever, and so held on the trial. No matter if it be admitted that the acquiescence began at the survey of the plaintiff; it does not help the defendant. Taking the facts found by the jury to be true, the justice erred in not ordering a verdict for the plaintiff, for the admitted value of the timber, as requested by the plaintiff's counsel, on the trial. After the finding of

the jury, of the facts specially submitted to them, and after the court had taken the case for further consideration, the plaintiff's counsel requested, in two propositions submitted to the court, that they should decide the law of the case to be as we have held. The court decided against these requests, and the plaintiff's counsel excepted. This we think was error. If these views of the law, as we hold them, are correct, then a new trial should be granted.

[St. Lawrence General Term, October 2, 1866. *James, Potter* and *Rosekrans,* Justices.]