All for affirmance, except LOTT, Ch. C., not sitting.  Judgment affirmed with costs.

---

ERASTUS CORNING and JAMES HORNER, Respondents, *v.* THE TROY IRON AND NAIL FACTORY, Appellant.

In an action of ejectment, the principal questions being the location of certain monuments, and whether there is an error in the length of a certain line as described, it is not error to refuse a submission of those questions to the jury and to direct their verdict, where the evidence is so conclusive that it would be the duty of the court to set aside a different verdict as against evidence, although there is some slight conflict of testimony.

To constitute a practical location of a lot, or line, the mutual act and acquiescence of the parties is requisite.  It must be actually located and acquiesced in for a long time, probably not less than twenty years.

To estop the plaintiffs from asserting their title to lands, on the ground that they have encouraged and permitted the defendant to make valuable improvements near them, it is not enough that the premises are convenient, or even beneficial to the defendant; they must be so far essential that it would work material and serious mischief to the defendant to allow the plaintiffs' claim.

In considering the effect of acts which are claimed to be such an adverse possession as may mature into title, reference should be had to the character of the property and the uses to which it would ordinarily be applied, for the purpose of ascertaining with what mind it was so possessed, on the one side, and such possession was permitted on the other.

Where the plaintiffs allowed their land to remain vacant for many years, its principal value to them being the right of flowing its banks in the use of adjacent water rights, which use was continuously exercised by them, the fact that the defendant has been suffered, during the same

time, to deposit refuse machinery and, temporarily, a few loads of stone on the premises, and to pass over them habitually as a convenient approach to its own property, there being no inclosure of, or permanent improvements on, the premises, is far from sufficient to constitute an adverse possession by the defendant. Under such circumstances, it is not error to refuse a submission to the jury of the question of adverse possession.

(Argued May 3d; decided September 12th, 1871.)

APPEAL from an order of the General Term of the Supreme Court in the third district, affirming a judgment in favor of the plaintiffs, entered upon a verdict rendered by direction of the court.

The action is ejectment for the recovery of a triangular piece of ground, located on the south side of the Wynant's kill, in the city of Troy, immediately in front of the rolling mill of the defendant. The premises in dispute embrace 4,650 square feet, or about six one-hundredths of an acre.

The land is described in the complaint as follows: " Beginning at the south-east corner of a six acre lot, formerly leased by David De Forest to John Brinckerhoof, by lease dated the first day of May, in the year one thousand eight hundred and nine, and at a point where formerly stood a marked hemlock tree, and running thence, from said point, along the southern boundary of the farm formerly owned by David De Forest, south eighty-eight degrees west, one hundred and fifty feet; thence due north, twelve feet to the westerly end of a dock on the south bank of the Wynantskill creek; thence along said dock, north seventy-one and one-fourth degrees east, one hundred and fifty feet to the eastern boundary of said six acre lot; thence along said boundary south twelve and a half degrees east fifty feet to the place of beginning, containing 4,650 square feet, be the same more or less."

On the twelfth day of April, 1788, Stephen Van Rensselaer conveyed, by deed of warranty, to Jeremiah Lansing, a farm of 125 acres, lying upon the east bank of the Hudson river, upon and near the mouth of the Wynant's kill, and in what is now the sixth ward of the city of Troy.

On the first day of January, 1789, Jeremiah Lansing conveyed this farm by deed of warranty, to David De Forest, making, however, the following exception and reservation in the deed: "Excepting and always reserving one acre of land on the south side of the creek and adjoining to the creek where the line crosses the said creek, unto Stephen Van Rensselaer, Esquire, proprietor of the manor of Rensselaerwyck, and to his heirs and assigns forever."

About the year 1791 or 1792, David De Forest moved onto the farm which he bought of Lansing, and continued to reside upon it until his death. He devised that farm to Abraham De Forest and John De Forest. His will was proved and recorded as a will of real estate, 27th September, 1815.

John De Forest died, having devised his interest in the said farm to his two daughters, Rachel and Eliza Maria. His will was proved, as a will of real estate, in 1834.

Rachel and Eliza Maria, the daughters of John De Forest, died, leaving no children or heirs in the direct line, and their interest in said farm, being one equal undivided half thereof, descended to their uncles and aunts, to wit, Abraham W. De Forest and Lucas De Forest, Rebecca, the wife of Martin De Freest, and Gertrude, the wife of a Mr. Fonda.

Abraham W. De Forest, or De Freest, as the name is now written and pronounced, has always resided upon this farm, and still resides there.

On the 1st of May, 1809, David De Forest leased to John Brinckerhoof, for the term of forty years, at a rent of $450 per year, two pieces of land lying on the Wynants kill, and being part of the farm conveyed to him by Lansing, one piece containing six acres, "be the same more or less," and the other one-eighth of an acre.

The description of this six acre lot is: "Beginning at a marked hemlock tree standing on the south side of a stream of water commonly called Wynants kill, and at the distance of two chains and seventy-three links on a course south eighty-six degrees east from the north-west corner of the dwelling-house of the said David De Forest, and running from the said

hemlock tree north six degrees east two chains and forty-seven links to the north-west corner of a horse-stable; thence south eighty-seven degrees forty-five minutes west four chains and forty-four links to a small marked walnut tree; thence north twenty degrees east four chains and seventy-five links to a stake; thence south seventy-one degrees east twenty chains and twenty links to a marked white oak sapling tree; thence south twelve degrees and thirty minutes east about four chains to a marked hemlock tree standing on the south side of the before mentioned Wynants kill; and thence down the south side thereof to the place of beginning, containing about six acres, be the same more or less."

The evidence showed conclusively that there was an error in the second line, the length thereof being too great, and which was corrected by the surveyors so as to " close the survey" and correspond with the monuments.

John Brinckerhoof went into possession of the six acre lot under this lease, and over fifty years ago put up mills on the creek which runs through it, and occupied it for manufacturing purposes, and it has been occupied for manufacturing purposes ever since.

The plaintiff Corning became, by various subsequent assignments, owner of this lease, and of the lessee's interest in the premises, on the 1st of August, 1833.

This lease expressly embraces in its description " all waters and water-courses," etc., belonging to or appertaining to the leased premises.

On the 16th day of January, 1843, Abraham W. De Freest and wife, by their separate deed, conveyed all their interest in the six acre lot to the plaintiffs; and, on the 27th of June, 1844, Lucas De Freest and wife, Rebecca De Freest and her husband Martin De Freest, and Gertrude Fonda, united in another conveyance of the six acre lot to Erastus Corning. Both of these deeds refer to the lot as that which had been leased to Brinckerhoof, and convey the property by the same description as is contained in the lease to Brinckerhoof, including all waters and water-courses, and do not mention the reservation

or exception of any part of it to Van Rensselaer. There is no other stream of water on the six acre lot but the Wynants kill.

At the time of these conveyances from the De Freests, and for many years previous, the plaintiff, Corning, and his copartners were in possession of this six acre lot, holding under the Brinckerhoof lease, and claiming the whole of the lot. The plaintiffs' works were called the Albany iron works.

The defendant is a manufacturing corporation, and on the 1st of May, 1817, it, by John Converse, its agent, took a lease from Abraham W. De Freest and John De Freest, of a lot of land containing seven acres, etc., and lying next eastwardly and adjoining the six acre lot on the west. This lease was for thirty-four years and nine months, at a rent of $100 per year.

The seven acre lot was a part of the farm conveyed by Lansing to De Forest by deed, dated January 1st, 1789, and the acre reserved by that deed to Stephen Van Rensselaer is also in and by this lease reserved to Van Rensselaer out of the seven acre lot, in the same language used in the original reservation contained in the Lansing deed.

The defendant went into possession of the seven acre lot under that lease, and held it until the expiration of the lease.

The description of the seven acre lot leased by this lease commences at a hemlock stump on the south bank of Wynants kill, on the south line of the farm, at the south-east corner of a lot of land heretofore leased by David De Forest to John Brinckerhoof & Co., running thence along the east line of the last mentioned lot, north twelve degrees and thirty minutes west four chains to a marked white oak sapling, the north-east corner thereof.

Abraham W. De Freest testified that this hemlock tree stood in the south-west corner of the seven acre lot leased to Converse and in the south-east corner of the six acre lot leased to Brinckerhoof, and was in the south line of his father's farm; the line between it and the Covill farm. It was blazed and hacked on the long line, and marked on the east and west

sides; was a foot through, and stood about six feet out of the bank from the creek. That he could stand on the bank of the creek and reach his hand out and touch the tree, which came out of the bank of the creek about six feet below where he stood, the bank of the creek being at that point nearly perpendicular, and the top of the bank fifteen or twenty feet above the water.

The old house of David De Forest is still standing, in the same position that it was in 1809.

In 1838 the defendant marked out the grounds on the south side of the creek, near where this hemlock stood, for the building of a rolling mill. At that time the bank of the creek at that point, and where the defendant's dock now is, was in its natural state. There had then been no filling in there.

This rolling mill, which was of wood, was built there and completed in 1839, and since that the present brick rolling mill has been built, larger than the wooden one and around and over it.

The plaintiffs had, previous to this time, three dams, which had been built on the creek, below or west of the east line of the six acre lot, and large manufacturing establishments connected with them. The upper or eastern of these dams set the water back within fifteen or twenty feet of the eastern line of the six acre lot, and, at times of high water, quite up to it.

In September, 1844, the defendant built a dock at the point where the filling had been put in. A number of witnesses on the part of the plaintiff testified that this dock, at the widest part, extends out into the creek some twenty-five to thirty feet from the natural bank of the stream.

This dock is about 122 feet long, 100 feet of which is on the six acre lot. The 100 feet extends westerly from the point of the hemlock tree.

While this dock was being built for the defendant, the plaintiffs remonstrated against the building, and claimed that it was on the plaintiffs' premises; this remonstrance was communicated to Burden, the agent and president of the defendant.

From the face of the dock back to the rolling mill is fifty-five feet; i. e., from the face of the dock to south line of the De Freest farm fifty feet, and five feet thence to rolling mill.

The plaintiffs claimed that the east line of the disputed premises was a part of the east line of the six acre lot, and fifty feet long. That the south line ran from the east line of the six acre lot, westwardly to near the west end of the dock, 100 feet, and until, at that distance, it intersects the front of the dock.

The defendant claimed an adverse holding and occupation of the disputed premises, and showed the following acts of use and occupation : Some wheels and old gearing were piled on the bank of the creek, and remained there several years. There was a wagon path upon the bank. There was, also, a foot path, used by persons going down the bank to get water from the creek. There was a small privy very near the west end of the dock. It was a disputed question whether any part of it was east of the end of the dock. It was upon the top of the steep bank, and stood upon timber which projected over the bank. There were two loads of stone piled near the shovel factory, now called spike factory, and seven or eight feet distant from it, and remained there a long time.

This suit was commenced on the 4th of March, 1857. The defendant was then in possession of the disputed premises.

The plaintiff Corning and his associates have, ever since 1837, been in possession of the six acre lot, and claiming to hold the whole of it.

There have been three trials of the action, On the first trial the verdict of the jury was adverse to the plaintiffs. It was reversed, and a new trial had. (Reported 34 Barb. 529.) On the second trial the justice directed a verdict in favor of the defendant. The General Term reversed the judgment. A third trial was had, on which the presiding justice directed judgment for the plaintiffs for part of the premises claimed in the complaint, described as follows: Beginning at a point in the northerly face of the dock where it is crossed by the easterly line of the six acre lot, and running thence southerly

along said line, twenty-five feet; thence on a line parallel to the south line of the De Freest farm, to a point in the northerly face of the dock, and thence along said dock to the place of beginning.

The defendant requested the court to submit to the jury the question of the location of the hemlock tree; of the location and boundaries of the six acre lot; of the practical location of the excepted acre; of adverse possession and of estoppel. The court denied these requests severally, to which the defendant excepted. The General Term affirmed this decision, and judgment being entered the defendant appealed to this court.

*William A. Beach*, for the appellant, cited *Burnham* v. *Van Zandt* (7 Barb., 91); *Cunningham* v. *Knight* (1 Barb., 399); *French* v. *Carhart* (1 Comst., 96); *Seneca Nation* v. *Knight* (23 N. Y., 498); *Child* v. *Starr* (4 Hill, 369); *Adams* v. *S. & W. R. Co.* (11 Barb., 414); *Adams* v. *Rivers* (Id., 390); *Sizer* v. *Devereaux* (16 Barb., 160); Angel on Highways, §§ 316, 318; *Jackson* v. *Ogden* (7 John., 246); *Rockwell* v. *Adams* (6 Wend., 469); *Jackson* v. *McConnel* (12 Wend., 421); *Baldwin* v. *Brown* (16 N. Y., 359); *Welland Canal* v. *Hathaway* (8 Wend., 480); 2 Hillards Abridg., 143; *Beaupland* v. *McKean* (28 Penn., 124); *Howard* v. *Howard* (17 Barb., 665.

*Amasa J. Parker*, for the respondents, cited *Van Wyck* v. *Wright* (18 Wend., 57); 3 Kent's Com., 432, 520; Angel on Water Courses, § 23, p. 21; *Child* v. *Starr* (4 Hill, 369); *Sizer* v. *Devereaux* (16 Barb., 162); *Kingstrand* v. *Sparrow* (12 Barb., 201); *Baldwin* v. *Brown* (16 N. Y., 359); *Jackson* v. *Warford* (7 Wend., 62); Willard Real Est., 355; *Brandt* v. *Ogden* (1 John., 156); *Johnson* v. *Waters* (12 John., 365); *Watkins* v. *Holman* (16 Peters, 25); *Jackson* v. *Sharp* (9 John., 163); *Livingston* v. *Peru Iron Co.* (9 Wend., 511); *Emerick* v. *Kohler* (29 Barb., 165); *Clark* v. *Owens* (18 N. Y., 437); *Ridgely* v. *Johnson* (11 Barb., 539); *Bank of U. S.* v. *Davies* (2 Hill, 461).

GRAY, Com.   The defendant asks a reversal of the judgment in this case, upon the ground that questions of fact, adjudged by the judge at circuit, ought to have been submitted to and passed upon by the jury.   The first of the several questions presented is as to the true location of the easterly line of what is known as the six acre lot, of which the plaintiffs claim the premises recovered by them is a part. This lot was parcel of one hundred and twenty-five acres, conveyed in April, 1788, by Stephen Van Rensselaer to Jeremiah Lansing, and by Lansing, in January, 1789, to David De Forest.   No exception or reservation was made in the grant by Van Rensselaer to Lansing, but in the deed of the latter to De Forest, an acre of land " on the south side of Wynants kill or creek, and adjoining the same, where the line (of the land conveyed) crossed the creek " was excepted and reserved unto Stephen Van Rensselaer and to his heirs and assigns.   On the first of May, 1809, De Forest leased to John Brinkerhoof the six acre lot, by the following description: " Beginning at a marked hemlock tree, standing on the south side of a stream of water, commonly called Wynants kill, and at the distance of two chains and seventy-three links in a course south eighty-six degrees east from the northeast corner of the dwelling-house of the said David De Freest, and running from the hemlock tree north six degrees east two chains and forty-seven links to the northwest corner of a horse stable; thence south eighty-seven degrees forty-five minutes east four chains and forty-four links to a small marked walnut tree ; thence north twenty degrees east four chains and seventy-five links to a stake ; thence south seventy-one degrees east twenty chains and twenty links to a marked white oak sapling tree; thence south twelve degrees and thirty minutes east about four chains to a marked hemlock tree standing on the south side of the before-mentioned Wynants kill, and thence down the south side thereof as it winds and turns to the place of beginning; containing six acres, more or less;" with one other parcel of the same one hundred and twenty-five acres, containing one eighth of

an acre of land, with the waters, water courses, etc., belonging to or appertaining to those lots. The length of the second line of this survey, as it is described in the lease, is four chains and forty-four links, and is described as terminating at a small walnut tree. If the statement made as to the length of this line is accurate, the third line, commencing at its termination and extending north twenty degrees east four chains and seventy-five links, would terminate so far west that the fourth line, extending south seventy-one degrees east twenty chains and twenty links, having reference to the length of each line, as ascertained solely by its length of chain and links, would also terminate so far east that a line from its termination, south twelve degrees and thirty minutes east to the south side of the kill, would not include the premises in question. And thus the question is presented, not only whether a mistake was committed in that part of the description of the premises in which the length of the second line is stated to be four chains and forty-four links, but whether the evidence establishing it was so clear, that if the question had been submitted to the jury, and they had found otherwise, the verdict should have been set aside as against evidence. As proof of the mistake, it was shown that the monument called for in the lease at the termination of that line, distant four chains and forty-four links from its starting point, was not to be found ; that the westerly line of De Freest's farm, of which the six acres was intended to be a part, was on the course of the second line, but three chains and forty-five links from the starting point of that line, and that a third line, extending from the point in the westerly line of De Freest's farm northerly, on the course and extending the distance specified in the lease, corresponded with the westerly line of that farm, up to which the adjoining owners had occupied for more than thirty years prior to the commencement of this action. It was also shown, that starting from the termination of the distance described as the length of the third line in the westerly line of the De Freest farm, and running the course and distance called for in the lease, reached a

point where a white-oak sapling, corresponding with a monument described in the lease as the termination of that line, had stood, instead of which an iron bolt was found to have been driven and covered by the earth. From this point, running in a southerly direction on the course specified in the lease, to the south side of Wynants kill, a hemlock tree corresponding with the one described in the lease as the termination of that line, was shown to have been standing in or upon the bank of the kill. Thus, in my judgment, a mistake in the description of the second line was so clearly established, that a verdict to the contrary could not have been upheld; and hence the judge did not err in holding, as matter of fact, that the iron bolt was the northeast corner of the six acre lot, and that a line running from it to the hemlock tree on the south side of the kill, was its east line. If De Freest had intended to limit Brinkerhoof to the use of the kill or creek to its center, the ordinary mode of fixing that right would have been by bounding him by its west side. Instead of doing so, and as a fact quite significant of his intention to give him all the land covered by it, he ran across it to a monument in or upon its southerly side; and, after bounding by that side, gave him, in express terms, all waters and water-courses belonging or appertaining to the premises described in the lease. It was shown by the testimony of at least one witness, that from a period prior to 1837, the plaintiff, Corning, and his associates entered into possession of this six acre lot, and occupied, as a part of it, the bed of the kill and its banks, by flowing their water upon it. In the autumn of 1844, the defendant erected a dock of about 150 feet in length, along the south side of this creek, which extended westerly about 100 feet beyond the east line of the six acre lot. The bank was of uneven width, the south side forming an irregular line. The face of the dock, less irregular, encroached upon the bed of the creek to a variable extent, depending very much upon the irregularity of the south line of the creek. All this the defendant insisted was rightfully done, for the reason, as they claimed, that they had possessed

that portion of the premises in controversy covered by the dock, as a portion of a practical location of the one acre of land excepted and reserved by De Freest to Van Rensselaer, which had been acquiesced in by the plaintiffs and those under whom they claimed for a space of time sufficient to bar this action. They had placed no fence or other barrier upon or around what, upon the trial, they claimed to have located as a part of the undefined acre reserved to Van Rensselaer. In 1823 or 1824 they placed some old wheels along the edge or slope of the bank of the creek for a space of about forty feet, about twelve feet of which was west of the east line of the premises in question, and the wheels remained there some ten or fifteen years; and from two to five loads of stone were also kept there by the defendant and remained there some six months. It was also shown that, in 1826, the defendant erected a privy of eight or ten feet in length, overhanging the stream, partly upon and partly west of that portion of the bank now covered by the dock, and that, in 1839, they placed some boulders on the edge of the creek, which remained there when the dock was built. The object of placing them there was to protect the mouth of the tunnel or race constructed for the purpose of conducting the water from the defendant's rolling mill into the creek. How far the mouth of the tunnel was from the east line of the lot does not appear, except from the map, which indicates the distance to be not far short of 100 feet. These were the acts or the principal acts of possession relied upon by the defendant to establish its ownership of the premises, for the recovery of which a verdict was ordered at circuit. In determining the effect of acts like these proved to have been committed by the defendant, and claimed by them to be such acts of ownership as ought to bar the plaintiffs' action, we should keep in mind the character of the property and discover, if practicable, the object of owning it, by the uses to which it would ordinarily be applied; that we may the better understand not only the mind with which it was possessed, but on the other side, the mind with which the possession

such as it was, was acquiesced in.   The only conceivable value to the plaintiffs of the rights covered by the lease to Brinkerhoof, in the bed of the creek and its southern shore, was as a water course.   The case is without evidence that the plaintiff was ever made aware that the defendant even claimed to hold any portion of it under a practical location of the excepted and undefined acre reserved to Van Rensselaer.   The fact that useless wheels were strewed along the slope of the bank, extending some twelve feet west of the eastern boundary of the six acre lot, and remained there some ten or fifteen years, and that from two to four loads of stone were also there for six months ; that a privy was erected upon the bank, partly over and partly west of the dock, which overhung the stream, and boulders were placed in the edge of the bank near by to protect the mouth of the race leading the water from the defendant's rolling mill into the creek, did not in any material respect interfere with the plaintiffs' possession in the premises, which the witness Winslow testified was enjoyed by the plaintiff, when he said that, from a period prior to 1837 up to the time of erecting the dock, the plaintiff had " occupied the bed of the stream and the banks in connection with it, by flowing the water upon it."   And thus I am brought to the conclusion, not only that the plaintiffs were entitled to recover the land covered by the bed of the stream, but its southern shore, so as to secure to them the full use of the bed and shore as a water course.   Hence the ruling at circuit, that the plaintiff was entitled to recover that part of the premises lying upon the bed of the creek, was right, as was also the ruling, upon the uncontradicted evidence, that the dock was built into the stream ; but whether at the easterly line of the lot it encroached upon the bed of the creek beyond its southerly bank twenty-five feet, is involved in some doubt ; but as to that there is no exception.   I am, therefore, of the opinion that the judgment of the Supreme Court should be affirmed.

EARL, C.   This case has been pending upward of fourteen years, and has been three times tried, and three times before

the General Term. If the litigation can be ended upon this appeal, it will be a relief to the courts, if not fortunate for both parties.

The plaintiffs claimed the disputed piece of land as part of the six acre lot to which they showed undisputed title. They claimed it as lying in the southeast corner of that lot, and bounded southerly by the southerly line of the farm formerly owned by David De Freest, and easterly by the easterly line of the six acre lot. As they claimed it, the easterly line was fifty feet long, and the northerly and southerly lines one hundred feet long, and the westerly line twelve feet long; and to the whole of this piece, on the trial, the plaintiffs attempted to establish title. At the close of the evidence the court directed the jury to find a verdict for the plaintiffs for that part of the disputed piece described as follows: "Beginning at a point in the northerly face of the dock where it is crossed by the easterly line of the six acre lot, and running thence southerly along said line twenty-five feet; thence on a line parallel to the south line of the De Freest farm to a point in the northerly face of the dock; and thence along said dock to the place of beginning." This piece was the northerly part (less than half in size) of what the plaintiffs had claimed. The question for us to determine is, whether the facts were so undisputed that the court had the right to take the case from the jury and order this verdict.

I think all the lines of the six acre lot were established with reasonable certainty, so that there could be no question as to them, except the southerly line. It was undisputed that the easterly line extended to the point where the marked hemlock tree mentioned in the lease from De Freest to Brinckerhoof formerly stood, and that the southerly line commenced at the same point. The main controversy upon the trial was as to the precise location of the hemlock tree. The plaintiffs claimed, and gave strong evidence to establish, that it was in the southerly line of the De Freest farm. But the evidence upon this point was not conclusive; and, if the court had ordered a verdict giving the plaintiffs the land down to this

line, it would have infringed upon the province of the jury, and committed error which would have called for a reversal of the judgment.

The lease from De Freest to Brinckerhoof describes the hemlock tree as standing on the south side of Wynant's kill, and the southerly line as running down the south side of the kill as it winds and turns. We must infer from this language that the tree was on the bank of the stream. This line run to a marked hemlock tree standing on the south side of the stream, which was shown by undisputed evidence to have been eight or ten feet from the water, and five or six feet from the top of the bank. The hemlock tree at the south-east corner, the location of which is described in substantially the same language, was probably about the same distance south of the water of the stream, and thus the line would be carried, according to the description, properly and regularly, from point to point; and there is some evidence, though not conclusive, by witnesses speaking from actual observation, that the tree was thus located.

Abraham De Freest, son of David, was a witness upon the trial, and testified that he knew this hemlock tree; that it stood on the side of the southerly bank of the stream, which was at that point fifteen or twenty feet high; that it came out of the bank about six feet below the top, and about ten feet from the water; that he could stand on the top of the bank and reach his hand against the tree. The evidence of several other witnesses, who claimed to have seen the tree, or one resembling it, tends to locate it at or near the same point; some of the witnesses placing it farther south. No witness and no evidence of any kind placed this tree farther north, and hence the court was at least authorized to hold that the east line of the six acre lot extended as far south as the point where the witnesses located the tree, and that the southerly line of the lot extended westerly from that point.

The next question, and the important and controlling one in the case, is whether the land awarded to the plaintiff by the verdict is northerly of this line.

The tree stood near the edge of the top of the bank, and the bank, according to nearly all the evidence on both sides, sloped somewhat from the top toward the edge of the stream.

The defendant built its dock upon the disputed piece in 1844, and the following is the evidence of plaintiff's witnesses as to the extent that the dock was built out from the bank toward and into the stream:

Winslow, who became acquainted with the location in 1837, testified that he saw the dock built, and that it was built out from the bank fifteen to twenty feet at the base, and from twenty to twenty-five feet at the top; at the farthest point twenty-five feet. Snyder, who had been familiarly acquainted with the premises since 1835, testified that he saw the dock built, and that at the base the timbers extended into the stream from fifteen to twenty feet. Fellows testified that he had been acquainted with the location since 1825, that he built the dock for defendant, and that the face of the dock was thirty or forty feet at the top from the natural bank. Franks testified that he had been acquainted with the property since 1817, and that the dock was built out twenty-five or thirty feet from the original bank; and Hitchcock, who had known the premises since 1810, testified to the same thing. Edmunson testified that he had known the premises since 1818, and that the dock was built out from the original bank twenty-five feet, or about that distance. Groudy, who had known the premises since 1814, testified that the dock was built out into the stream about thirty feet at the east line of the lot; and Williams, who had known the premises about the same length of time, testified that the dock was built out at the same place from twenty-five to thirty feet. Hunter, who had known the premises since 1820, testified that the dock was built out into the stream at the bottom fifteen or twenty feet; and Luce, who had known the premises since 1832, testified that the dock was built out into the stream twenty or twenty-five feet.

These witnesses all speak of the dock upon the disputed premises, and, so far as I can discover, there was no pretence

or claim to the contrary upon the trial. They had all been familiarly acquainted with the premises for many years, and had abundant means of knowing the facts to which they testified. The dock upon the disputed premises was widest at the easterly line and wider at the top than at the bottom. If, therefore, the witnesses can be relied on, there can be no reasonable question that the dock encroached upon plaintiff's land, at least, to the extent determined by the verdict.

On the part of the defendant, Henry Burden, the principal witness for the defence, who had been superintendent of defendant's works, since 1823, excepting one year, and who caused the dock to be built, did not materially contradict the evidence on the part of the plaintiff, as to the extent the dock had been built out from the bank. He testified that the line of the dock pursued the course of the bank, and that the face of the dock was on a line with the face of the bank, but not that the dock did not extend into the stream from the bank. He also testified that there was a stone wall two feet high, made of boulders, placed in the stream, to protect the bank and the mouth of a tunnel, before the dock was built, and that the dock was built just inside of the wall, but he did not testify that the stone wall was at the base of the bank or the edge of the stream. He admits that the dock was built across the curve in the stream, and the maps annexed to the case show that most of the curve was westerly of the easterly line of the disputed premises.

William F. Burden, who was a lad about fourteen years old when the dock was built, testified that he saw it built and that it did not extend out beyond the face of the bank, except, as I infer, at the curve in the stream. No other witness gave any material evidence on the part of the defence contradicting the case on this point, as made by the witnesses on the part of the plaintiff. These ten witnesses testified as to facts in reference to which they could not well be mistaken. They spoke of the length of the timbers placed out from the bank in the bed of the stream. If they were mistaken, it seems to me, that it would have been easy to have found many wit-

nesses to have contradicted them. It would be a mockery of justice to hold that, upon the evidence on the part of the defence, mainly that of a single witness, a jury could properly have found for the defendant against the numerous witnesses upon the other side. If the plaintiffs had simply sued for the piece of land which they were allowed to recover, and after such evidence, the jury had found for the defendant, it would have been the duty of the court to have set aside the verdict; and that being so, it was right in ordering a verdict for the plaintiff. In all cases where it would be the duty of the court to set aside a verdict against a party as against evidence, it is authorized to order a verdict in favor of that party, without submitting the facts to the jury. The court is authorized to set aside the verdict of a jury, not only where it is against all the evidence, but when it is so clearly and plainly against the weight of evidence as to show that the jury were mistaken or influenced by prejudice, passion, or some other improper motives.

Aside from the evidence already alluded to, I can find no circumstances in the case materially affecting the evidence on the part of the plaintiff. On the contrary, the most of the other evidence in the case tends to show that the southeast corner of the six acre lot was still farther south in the southerly line of the De Freest farm. The length of the easterly line, as laid down in the various deeds put in evidence, calls for a termination of that line, at least, as far south as it was established by the verdict of the jury.

The southerly line of the disputed piece, as established by the verdict ordered, is a straight line running a distance of sixty-five or seventy feet to a point in the northerly face of the dock, constantly approaching the margin of the stream. It is claimed on the part of the defendant that this was error, because the line, as described in the lease, was one running along the south side of the stream as it winds and turns. There was no evidence, and no claim at the trial, that there was any turn to the north in the stream for this brief space of sixty-five or seventy feet, and it is not apparent how a

line, assuming · that it started right, which constantly approaches the stream, can do any injustice to the defendant. This straight line is an arbitrary one assumed by the judge at the trial by the consent of the plaintiffs, not as absolutely correct, but as sufficiently favorable to the defendant. It did not extend to the westerly end of the dock, where there was some evidence that the face of the dock was a little south of the brink of the embankment, but it terminated twenty-five or thirty feet easterly from the west end, and, as I understand it, there is no claim that the face of the dock is not, at that point, out as far at least as the brink of the embankment.

I am, therefore, of the opinion, that the court committed no error in holding upon the evidence, that the piece awarded to the plaintiffs was part of the six acre lot; and I will proceed to examine the other questions raised by the learned counsel for the defendant.

He claims that the disputed piece was a part of a certain one acre piece of land reserved in the deed from Lansing to De Freest, and became such by practical location. In order to establish a line by what is called practical location, it must actually be located, and must be acquiesced in for a long time, probably, at least, twenty years, unless there is an element of estoppel in the case. (*Baldwin* v. *Brown*, 16 N. Y., 359; *Reed* v. *Farr*, 35 N. Y., 113; *Emerick* v. *Kohler*, 29 Barb., 165; *Hubbell* v. *McCulloch*, 47 Barb., 287.) To constitute a practical location of a line or a lot requires the mutual act and acquiescence of the parties. Here there is no evidence whatever that the plaintiffs ever participated or acquiesced in the location of the one acre lot, so as to include the piece awarded to them, or that they ever knew that it was so located. There can be no claim that any line was practically established before the dock was built, and when that was built, the plaintiffs objected, and there is no proof that they ever acquiesced in it. On the contrary, they objected, and within thirteen years commenced this action.

It is further claimed, that the plaintiffs are estopped from

claiming the piece of land, on the ground that they and those under whom they claim have encouraged and permitted the defendant to make its valuable improvements near their premises. The only improvement or erection that the defendant ever made upon their premises was the dock, and this the plaintiffs objected to at the time, except the tail race, and that was saved to it in the verdict and judgment; and hence this is not a case where it was induced, encouraged or permitted without dispute or objection, to make valuable improvements upon the land claimed. If the plaintiffs did not own the land south of the line established by the verdict, they had no right to object to any erection south of that line. Besides, there is no proof that the piece of land recovered by the plaintiffs is essential to the enjoyment by the defendant of its lands south of it, or that its recovery and possession by the plaintiffs will materially interfere with defendant's valuable improvements. In any event the plaintiffs could not be estopped from claiming this piece, simply because it was convenient or even beneficial to the defendant. It must be so far essential, if the doctrine of estoppel is to apply, that it would work material and serious mischief to the defendant, if they were permitted to take and claim it. I am, therefore, quite clear that there was nothing upon this question of estoppel to submit to the jury, and nothing in it to bar plaintiffs' recovery.

The only remaining question is that of adverse possession. The piece of land awarded to the plaintiffs was never fenced or cultivated, and prior to the erection of the dock was never in any sense improved. It was included in no paper title held by the defendant, and there was no continued occupancy by the defendant. Its servants and agents occasionally, and it may be frequently, passed over it, and old wheels and other material were sometimes deposited upon the slope of the bank. But all these acts and circumstances were far from sufficient to constitute an adverse possession.

I have now, as fully as necessary, examined all the questions argued before us with much learning and ability, and the best consideration I have been able to give the case has

brought me to the conclusion that the judgment should be affirmed, with costs.

All concur for affirmance .

Judgment affirmed, with costs.