*ALBANY,*
*August, 1811.*

CORP
v.
UNITED
INS. CO.

———————

CORP and others *against* THE UNITED INSURANCE
COMPANY.
SAME *against* THE SAME.
SAME *against* THE PHOENIX INSURANCE COMPANY.

THESE were actions on three separate policies of insurance.   The first was dated the 31st of *October*, 1807, upon certain articles, (8,750 pieces of nankeens,) specified in the policy, as part of the cargo of the ship *Hero*, *Barnard*, master, valued at the sum insured, at

Insurance from
*New-York* to
*Leghorn.* The
vessel sailed
from *New-York*
the 1st of *No-*
*vember*, 1807.
On the 9th of
*January*, 1808,
within the

*Straits*, and about 60 or 70 leagues from *Leghorn*, the vessel was boarded by a *British* vessel of war, the commander of which endorsed her register, warning her not to proceed to *Leg-* *hora*, nor to any port of *France* or *Spain*, *Portugal*, *Holland*, *Denmark*, *Tuscany*, *Naples*, *Ra-* *gusa*, the republic of the *Seven Islands*, or to any other country at war with *Great Britain*, or from which the *British* flag was excluded, under pain of being confiscated, such ports being declared to be in a state of blockade, by the *British* orders in council of the 11th of *November*, 1807, and the vessel was warned not to proceed to any such ports, without first stopping at a *British* port.

The vessel put into *Gibraltar*, where the captain was informed of the *French* and *Spanish* decrees; and was refused a clearance to any but a *British* port.  Under these circumstances, and fearing a capture, in case he proceeded to any port in the *Mediterranean*, the captain took a clearance for *Falmouth*, and sailed for that place under *British* convoy, where he arrived on the 23d of *March*, 1808.  The insured abandoned for a total loss; and it was held that neither the fear of capture and condemnation, nor the circumstances in which the vessel was placed, afforded a justifiable cause for abandoning the voyage, and that the insurers were discharged.

The endorsement on the register, and warning by the *British* cruiser, was not an act of search, or a *visit*, within the true construction of the *Milan* and *Aranjuez* decrees, or the law of nations; nor was the vessel under the *restraint of princes* at *Gibraltar*, a clearance not being essential, and the threat of *British* capture did not amount to such a restraint.

ALBANY,
August, 1811.

CORP
v.
UNITED
INS. Co

and from *New-York* to *Leghorn*, at a premium of *5 per cent.*

From the deposition of the master, the following facts appeared: The ship sailed about the 1st of *November*, 1807, on the voyage insured.  On the 9th of *January*, 1808, the *Hero* was boarded by a *British* vessel of war, the commander of which obliged the master to exhibit the ship's papers, and endorsed her register, as follows: " His *B. M.* sloop *Grasshopper*, 9th of *January*, 1808.   Pursuant to his *Britannic* majesty's orders in council, you are hereby warned to discontinue your voyage to the port of *Leghorn*, upon pain of confiscation of ship and cargo, if found disobeying the above-mentioned order.   And you are, pursuant to further orders from his said majesty, hereby informed, that if you are found proceeding to any port or place of *France* or *Spain*, *Portugal*, *Holland*, *Denmark*, *Tuscany*, *Naples*, *Ragusa*, or the islands lately composing the republic of the *Seven Islands*, or any other country at war with his *Britannic* majesty, or from which, though not at war with his said majesty, the *British* flag is excluded, your ship and cargo will be confiscated as lawful prize to the captors, the above-mentioned ports being declared in a state of blockade."   The commander of the *British* ship, at the same time, informed the master of the *Hero*, that in consequence of the orders in council, she would not be permitted to proceed to *Leghorn*, or any of the ports mentioned in the endorsement on the register, without first stopping at some *British* port, and that if she attempted to proceed to any of the said ports, both ship and cargo would be liable to be captured by any *British* vessel of war, and condemned as good prize.   The master of the *Hero*, under these circumstances, deemed it his duty, and for the interest of all concerned, to touch at *Gibraltar*, that being the nearest *English* port, and accordingly arrived at *Gibraltar*, with the ship and cargo, on the 11th

ALBANY,
August, 1811.

CORP
v.
UNITED
Ins. Co.

of *January*, 1808, where she was subjected to quarantine, until the 24th of *January*. He found at *Gibraltar* 20 or 30 sail of *American* vessels, bound up the *Mediterranean*, many of whom had stopped there, in consequence of having their registers endorsed, and being warned by *British* cruisers. That about the 12th of *January*, the master received intelligence of certain *decrees (Milan* and *Aranjuez)* of the *French* and *Spanish* governments, declaring that any neutral vessel which should suffer herself to be stopped or visited by an *English* ship or vessel, or should have submitted to put into an *English* port, or should pay any imposition to the *English* government or its officers, should thereby lose its national character, be no longer protected by her flag, and be considered as *British* property; and that if any such vessel, after having thus lost her national character, should enter the harbours of *France* or *Spain*, or their allies, or fall into the hands of the *French* or *Spanish*, she should be good and lawful prize. These decrees were published in the gazette at *Gibraltar*. The master believing that in consequence of these decrees, and the number of *French* and *Spanish* cruisers in the *Mediterranean*, the *Hero*, if she proceeded on her voyage, would certainly be captured and condemned, determined, after taking the best advice, to abandon the voyage to *Leghorn*, and return with the ship and cargo to *New-York*. He accordingly applied to the officers of the government at *Gibraltar*, for a clearance to the *United States*, which was refused; and he was informed by the officers of the government, that no *American* vessel would be permitted to clear or depart from *Gibraltar* for any but a *British* port. Not being able, with the intercession of the *American* consul, to obtain a clearance for the *United States*, the master determined to take a clearance for *Falmouth*, in *England*; hoping, after he had obtained his clearance for *Falmouth*, in *England*, and departed from *Gibraltar*, he should not be intercepted by any *British* cruiser, but

be allowed to proceed to the *United States*. In order, however, to ascertain whether he should be interrupted, if found proceeding to the *United States*, with the clearance for *Falmouth*, the master, on the 28th of *February*, 1808, applied to the commander of a *British* man of war, the *Windsor Castle*, lying in *Gibraltar*, and stated that he had obtained a clearance for *Falmouth*, and desired to know if he would be interrupted by *British* cruisers, if he attempted, after leaving *Gibraltar*, to proceed to the *United States*. He was informed by the *British* commander, that if he attempted to proceed from *Gibraltar*, for any but a *British* port, he would be liable to be captured by any *British* cruiser, and condemned. The master, under these circumstances, and with the advice of the *American* consul, set sail on the 29th *February*, 1808, from *Gibraltar*, under convoy of a *British* vessel of war, for *England*. During the voyage, the vessels under convoy were chased, on the 17th of *March*, by two *French* frigates, when the convoy made a signal for the vessels, under her charge, to part, and make the best of their way to the port of destination. The *Hero* accordingly parted from the convoy, and arrived at *Falmouth*, in *England*, on the 23d of *March*.

The master further deposed, that it was solely the fear of capture and condemnation, in proceeding to the port of *Leghorn*, or to any other port in the *Mediterranean*, which induced him to break up the voyage, and not attempt to proceed to any port in the *Mediterranean*, and that in every thing relative to the ship and cargo, and the intended voyage, he acted with the best advice, and solely for the interest of all concerned.

On his cross examination, the master stated that when he was boarded by the *Grasshopper*, he was within the *Straits*, and about 60 or 70 leagues from *Leghorn*, and after his register was endorsed, he was verbally directed by the commander to touch at *Gibraltar* before he pursued his voyage; that at the time he was boarded, he had

been beating for several days against a *Levanter*, an easterly wind prevailing in that sea, which continued several days after his arrival at *Gibraltar;* and that had he been left to pursue his voyage, it would have taken 10 or 12 days to reach *Leghorn*, during which time he could not have failed to have fallen in with *French* and *Spanish*, as well as *British* cruisers.

It was admitted, that the plaintiff had made due proof of interest, and had duly abandoned. The *British* orders in council of the 11th of *November*, 1807, the *Milan* decree of the 25th of *December*, 1807, and the *Aranjuez* decree of the 3d of *January*, 1808, were read in evidence.

The policies in the first two causes contained the following written clauses: " Warranted *American* property; proof whereof, if required, to be made here only. In case of capture or detention, not to abandon in less than six months after advice thereof at this office, or until after condemnation. If turned away for attempting a blockaded port, the assured to be at liberty to proceed to a port not blockaded."

In the third cause, the policy contained the following written clause: " Warranted *American* property; proof to be required here only. Also warranted not to abandon, if detained or captured, until after a detention of six months, unless previously condemned, nor if refused admittance, or turned away, but may proceed to another near open port."

A verdict was taken for the plaintiff for a total loss, with liberty to either party to turn the case into a special verdict. The other two causes being similar, it was agreed that they should abide the event of the first.

A motion was made to set aside the verdict, and for a new trial.

*Colden,* for the plaintiff. Most of the points arising in this case, were decided in the case of *Craig* v. *The United*

ALBANY,
August, 1811.

CORP
v.
UNITED
INS. Co.

* 6 Johns. Rep.
226.

*Insurance Company.** There are some facts, however, which distinguish the present from that case. The terms of the endorsement on the register of the *Hero*, are much stronger, and more comprehensive, than those used in the case of the *Amiable Matilda*. The going into *Gibraltar* was justifiable. This was not questioned in *Craig* v. *The United Insurance Company*. After the arrival of the *Hero* in that port, she was under continual restraint by the *British* government. She was refused a clearance to any but a *British* port, and, after obtaining a clearance, the master was informed that he would be captured and condemned, if he attempted to return to the *United States*. The ground of abandonment is a *restraint of princes*, not the fear of capture.

Again, there was a justifiable cause for abandoning the voyage, on the ground of the port of destination being shut. It is admitted that the plaintiffs have duly abandoned for a total loss; that is, for whatever was a justifiable cause.

*Hoffman* and *T. A. Emmet*. Every point that can arise in this cause has already been decided in the cases of *Craig* v. *The United Insurance Company*, and *Tenet* v.

† 7 Johns. Rep.
363.

*The Phœnix Insurance Company*.† There is no substantial difference between this case and that of *Craig* v. *The United Insurance Company*.

The clause in the policy had reference to the turning away from a blockaded port, not to the new practice of turning away under orders of council. The clause provides, that in case the port of destination is blockaded, the insured may be at liberty to go to a port not blockaded. There is no evidence that *Leghorn* was, in fact, blockaded. If not, the master ought to have proceeded. If *Leghorn* was blockaded, then he ought to have gone to a port not blockaded. But the master elected to go into *Gibraltar*. He was not compelled to go in there; he had passed that port, and he returned. The neutral is

not bound to obey the orders of a belligerent, unless the belligerent has a right, by the law of nations, to order. There was no prohibition as to the ports in the *Ecclesiastical States*, in *Italy;* the *British* flag was not excluded from any places within the papal territories. The *Hero* might, then, have proceeded to *Civita Vecchia.* A head wind or *Levanter* was no excuse for not proceeding there, or to the nearest open port to *Leghorn.* She might have gone to *Messina;* the *French* have never occupied the island of *Sicily.* Why not go to *Malta?* If she had gone to *Malta*, she might have left it before hearing of the *French* and *Spanish* decrees. We say, then, on the principle of the decision in the case of *Tenet* v. *The Phœnix Insurance Company*, the going into *Gibraltar* was a deviation. The vessel lay in that port a month, after the expiration of her *quarantine*, without any cause assigned for the delay.

ALBANY, August, 1811.

CORP v. UNITED INS. Co.

If she rightfully went into *Gibraltar*, then the policy by the *United Insurance Company* was at an end; for the clause does not protect her in going to more than one port not blockaded. If the words " near open port," mean the nearest port geographically, and all the ports in the *Mediterranean*, except *Gibraltar*, were shut, then that was the nearest open port, and the policy by the *Phœnix Insurance Company* ended there.

It is said that after the *Hero* arrived at *Gibra'tar*, she was under restraint; but there was no restraint, except the refusal of a clearance to any other than a *British* port. A clearance is matter of form. It is the common practice to take a clearance for one port and go to another. After clearing for *England*, she might, when at sea, have gone where she pleased. Then why not go to *Leghorn* or the *United States?* The master states the reason; a *fear of capture* by the *English.* The case then comes precisely to that of *Craig* v. *The United Insurance Company.*

Again, we may say, if all the ports were shut, except *Falmouth*, or a port. in *England*, then *Falmouth* became the *nearest open port*, and the voyage ended there.

*Harison*, in reply. We do not mean to controvert. the case of *Craig* v. *The United Insurance Company*, but we contend that this case is distinguishable from it.

The clauses in these policies were not inserted with a view to the circumstances which actually took place. If, then, as has been said, they did not refer to the orders in council, the case must be decided as if no such clauses had been inserted.

Admitting that the endorsement on the register, and all the acts of the *British* officers, were against the law of nations, and unauthorized, still the master is to be considered under the restraint and coercion of princes or powers. It is true, the master of the *Hero* was not bound to obey; but as he was unable to resist *British* capture, he was under coercion and restraint. Had he attempted to have gone to *Civita Vecchia*, he would have been liable to seizure by the *British*. Under the new and unforeseen circumstances which took place, the going into *Gibraltar* was an act of necessity and prudence, and perfectly justifiable.

The *Hero* could not go to *Leghorn* without being seized. Had she attempted to sail from *Gibraltar* without a clearance, she would have been liable to seizure; and if, after her departure, with a clearance, she had steered a different course than that which was in the rout to the port in her clearance, she would have been seized. *Falmouth* was a port of necessity, not of choice. Being under convoy for that port, she was compelled to proceed to *Falmouth*. The voyage was not abandoned *quia timet* merely; but there was an actual interposition of power and force, which amounts to a restraint of princes, within the terms of the policy.

VAN NESS, J. This case cannot be materially distinguished from that of *Craig* v. *The United Insurance Company*. (6 *Johns. Rep.* 226.) The voyage was voluntarily abandoned at *Gibraltar*, from fear of capture by *French* and *Spanish* cruisers, if the ship proceeded on her voyage to *Leghorn*. This is stated by the captain to have been the cause of breaking up the voyage ; and it is a clear and well settled principle in the law of insurance, that the fear of loss is not the loss itself, and is no justifiable cause for abandonment. Nor was the apprehension of seizure and confiscation at *Leghorn*, under the *Milan* decree, (if any such apprehension existed,) sufficient to create a loss of the voyage. There is no evidence in the case that *Leghorn* was blockaded, or that neutral trade with that port was interdicted ; and it was, at least, very doubtful, notwithstanding the decree, whether the ship in question could not have safely entered and discharged her cargo at *Leghorn*. She had not " submitted to be searched," within any just and equitable construction of the *Milan* decree ; for the object in boarding her, by the *British* cruiser, appears in this case, as it did in the case of the *Amiable Matilda*, (*Craig* v. *The United Insurance Company*,) to have been only to warn the vessel not to enter any port in *France*, or of her allies. The *British* cruisers were directed by the orders in council of the 11th *November*, 1807, to give such warning. If the belligerent *right of search* had been exercised in this case, the fact would undoubtedly have appeared in a more explicit and decided manner. The warning or notice according to the endorsement on the register, is the only evidence we have of the object of the visit, and that object the *British* vessels of war were at that time bound to pursue, in all cases, though no search might have been intended or required. If being boarded and warned brought the ship within the *Milan* decree, it might with equal propriety have been deemed so, if the ship had only been hailed at a distance, and interrogated and warned not to proceed.

The calling for the papers appears to have been only for the purpose of making the endorsement, so as to leave fixed and conclusive proof of the fact of *notice.* No other motive appears, or is left to be inferred. The captain states no fact of any interrogation or inquiry in relation to *search,* nor what papers in particular were produced. The words of the *Milan* decree, in order to check its severity as much as possible, are to be taken in the strictest sense, as referring to an actual and perfect exercise of the right of search into the character and quality of the neutral vessel, and her cargo ; and we are to presume that all maritime tribunals would have given them that construction. The plaintiffs, then, had no right to break up the voyage, and throw the loss of it upon the insurers, if the peril of loss at *Leghorn* rested (as most clearly it did) in mere apprehension and uncertainty.

Nor can the vessel be considered as under the " restraint of princes" while at *Gibraltar.* She was at liberty to depart when she pleased. No clearance was requisite. The captain was only threatened with danger of capture from *British* cruisers, if he proceeded to any other than a *British* port. This was a mere *threat,* without any legal authority to support it. There was nothing to hinder the ship from returning to *America.*

There was no present or existing restraint. The captain was only menaced with danger *in transitu.* The voyage to *Leghorn* was, therefore, voluntarily abandoned at *Gibraltar,* and the voyage to *England* voluntarily undertaken, from mere prudential considerations, with which the insurer had no concern. When the voyage to *Leghorn* was broken up, without any justifiable cause of abandonment, the defendants were discharged, and the sailing to *England* was the commencement of a new voyage.

The plaintiffs have not, therefore, shown a right to recover; and it has become unnecessary to decide another point raised upon the argument, which was, whether the return of the ship from the *Mediterranean* to *Gibraltar*

was, or was not, a justifiable deviation under the circumstances in which the ship was placed.  It was, at least, a very extraordinary cause of deviation, and it would be difficult to maintain that the cause assigned for it was sufficient.  I am, therefore, of opinion, that the defendants are entitled to judgment.

KENT, Ch. J. THOMPSON, J. SPENCER, J. and YATES, J. were also of the same opinion.

Judgment for the defendants.