By the Court.—Sedgwick, J.
In substance, the learned judge, on the trial, decided that the plaintiff *188 at the time of his conveyance to the city, of the strip in question, had no title thereto, and I think he took the correct view that if he had no title, there was no concealment, no misrepresentation, no fraud and no damage. The principal question in the case is, therefore, whether the judge was correct in holding as a matter of law that it had been shown that the plaintiff had no title.
The principles of law necessary for the decision of this case, are those I think stated by the court of errors in Adams v. Rockwell, 16 Wend, 285. This case has often been followed, and expressly approved in many cases. Terry v. Chandler, 16 N. Y. 1357, quotes the rule from Adams v. Rockwell: “Where there can be no real doubt, as to how the premises should be located according to certain known boundaries described in the deed, to establish a practical location different therefrom, there must be either a location which has been acquiesced in for a sufficient length of time to bar a right of entry under the statute in reference to real estate, or the erroneous line must have been agreed upon between the parties claiming the land on both sides thereof. Or the party whose right is to be thus barred must have looked silently on and seen the other party do acts or subject himself to expenses in relation to the land on the opposite side of the line, which would be an injury to him, and which he would not have done if the line had not been located, in which case perhaps a grant might be presumed within twenty years” (Jackson v. Ogden, 7 Johns. 238; Jackson v. Freer, 17 Johns. 29; Rockwell v. Adams, 6 Wend. 467, was reversed in the court of errors, 16 Id. 288 ; Hubbell v. McCullough, 47 Barb. 287). It is hardly necessary to observe, that it is not meant that a mere agreement between the parties claiming on both sides of the line, transfers a title to land.
Where, in case the boundary line is fairly disputed, *189 adjoining owners settle upon a line as a boundary line between their lands and acquiesce therein, their acts and parol agreement as to the line and the acquiescence are evidence as to the true boundary line, and if such acquiescence continue for a sufficiently long time, it .may be less than twenty years, it is considered conclusive evidence that the line settled upon is the true boundary line. Vosburgh v. Teator, 32 N. Y. 561, in which Judge Potter said that such a settlement of a boundary line where equivalents óf benefits or advantage are mutually received and acted on, will bind the parties to it, not by way of transferring title from one to the other, which the statute of frauds forbids, but operates by way of estoppel (Baldwin v. Brown, 16 N. Y. 359 ; Reed v. Farr, 35 Id. 117; Reed v. McCourt, 41 Id. 441; Ratcliffe v. Gray, 3 Keyes, 510).
And in such case without acquiescence for such a length of time as to make conclusive evidence and without an estoppel, a mistake of one or both parties, as to the facts, operates in like manner as it will in cases not affecting real estate (Coon v. Smith, 29 N. Y. 395).
Mere silent acquiescence. in an adverse possession according to an erroneous line, is no bar till it shall have continued for twenty years, although in a proper case it may be left to the jury to infer a grant (Jackson v. McConnell, 19 Wend. 177). Where there is no uncertainty as to the true boundary line, a mistake of an owner in pointing out an erroneous line as the boundary of his property, or in asserting it to be the true line, is not conclusive upon him. It is at most an admission against himself, which may be explained by testimony (Jackson v. Douglass, 8 Johns. 286; Stuyvesant v. Tomkins, 9 Id. 61; Jackson v. Woodruff, 1 Cow. 276).
It is clear that where there has not been any uncertainty of boundaries or of location, and possession has been transmitted by a grantor to a grantee under a *190 conveyance, a parol agreement between them that the land conveyed shall be deemed to be in another place, is wholly ineffectual.
The learned judge at the trial decided, that the conveyance to Wagstaff, by the city, under which the plaintiff claims, comprised land to the center of the two sixty feet streets on the north and south. In such case, the half of each street was part of the land granted. Wagstaff was the exclusive owner of the fee, of that part of each road, subject to the right of the public to. use it as a highway. Any use of it, by another person, except for a street or road, would have been a trespass upon the owner’s fee (2 Star. 1004; Goodtitle v. Alker, 1 Burr. 133 ; Jackson v. Hathaway, 15 Johns. 447 ; Whitbeck v. Cook, Id. 483 ; Cortelyou v. Van Brundt, 2 Id. 357; Gidney v. Earl, 12 Wend. 98 ; Babcock v. Lamb, 1 Cow. 238 ; Adams v. Rivers, 11 Barb. 391; Carpenter v. O. & S. R. R. Co., 24 N. Y. 655).
Therefore, the land owned in fee by Woolley, who succeeded to" Wagstaff’s right by various deeds, was in depth, the distance between the two old streets, viz : two hundred feet, and the half of each street, viz: sixty, together, two hundred and sixty feet. The depth of lot 143, was (so far as it was indicated by figures), stated, on the Goerck map and in the deeds referring to it, and in the documents used o.n the trial, in reference to what was called the adjustment of the boundaries, to be two hundred feet between the two streets. ' This,
I think, was one source of the mistake, of Woolley’s fee in the other sixty feet, being left out of view by both, as I believe, the corporation and Woolley him- 1 self.
In 1811, or about that time, the commissioners, by authority of the act of 1807, made a survey and map by which they designated upon lot 143, Seventy-eighth-street, sixty feet wide, as a public street. This was laid *191 down as having its southerly line about twenty-five feet and seven inches north of the southerly line of Woolley’ s land, that is the center line of the old street (Exhibit No.,4.) Four feet and seven inches of the south part of Seventy-eighth street, was placed upon the old road. On the north of the lot, Seventy-ninth street was in like manner laid down, with its southerly line almost exactly corresponding with the northerly line of the old street on the north, that is, about thirty feet north from the center of that old street, and from the northern line of Woolley’s fee. There was no contest on the argument, that by force of the act of 1807 the old streets were not abandoned as sites of highways after the survey and designation by the commissioners of the new streets.
We see then that as a matter of fact, Woolley, plaintiff’s grantor, was owner in fee, with undisputed title to the lot of two hundred and sixty feet in depth, subject to the rights acquired by the public or the corporation, in the land, on which Seventy-eighth-street was placed. No question arises in this case, as, to the nature of these rights. This left two distinct pieces of land of which Woolley had the right of exclusive enjoyment. One was north of Seventy-eighth-street about one hundred and seventy-four feet in depth, running from the center line of the old street on the north, to the north line of Seventy-eighth-street. The other ran about twenty-six feet in depth from the south line of Seventy-eighth-street to the center line of the old street, on the south. If the old streets had been freed from their devotion to public use, and Seventy-eighth street had not been placed, he would have had a perfect right, legally and equitably, to the exclusive use and enjoyment of a lot two hundred and sixty feet deep.
We have to see now if the testimony conclusively shows, that the title to this second and southern piece *192 of land, ever went from Woolley or Ms grantee, the plaintiff.
Before 1833, when, so far as the evidence shows, negotiations between the city and the owner of lot 143 began, there never was any doubt as to the actual place where the lot was. . If it is admitted that, looking at the map of G-oerck alone, there might be a .doubt as to whether the whole of the old cross road on the north was not part of the lot itself, yet that would only require a construction of the deed which conveyed the property in connection with the map, and the true legal construction left no uncertainty as to what lines included the land conveyed. There is no evidence, that as to any of the boundaries, laid down on the map, there was any doubt of where they were to be placed on the soil itself, when actual occupation should be taken. The real complaint made, as we learn from the documents, was not that the lot 143 (as it was termed) in fact and in law, was situated between the new Seventy-eighth and Seventy-ninth-streets, but that it was not there, as both sides knew and agreéd.
Whatever dissatisfaction-there was, in respect to the subject of the adjustment of boundaries, had not been settled when the report on William Wagstaff’s petition was made in November, 1834, but the committee states that the subject had been pending before the common council for about three, years. This of itself prevents a legal inference that there was undisputed evidence in the case, that before that time, a piece of land, which excluded the one in question, and having] new boundaries, had been taken possession of, by the consent, not to say agreement, of both parties, to be held by Woolley in lieu of the piece of land he had formerly occupied.
So far as this title .is affected by things done with the concurrence of the opposing parties, we have to look to the reports of committees of the common conn *193 oil, and the acts shown in the case, if any there are, to have been done with reference to those reports.
William Wagstaff, when owner of lot 143, and others, made their petition November 10, 1834, to the common council for an adjustment of the boundaries of common land lots owned by them in fee. The finance committee made its report. This did not result in any agreement, for Woolley, having become owner, made his petition September 26, 1836. This was the subject of reports in evidence. A resolution, approved February 22, 1837, was passed, that conveyances be made, to carry out ' the recommendations of the reports, as to the mode of settling the difference between the corporation and Woolley.
From these papers it is clear that Woolley only claimed to own lot 143, as it was constituted by the old deed and map. The corporation admitted this claim. Neither presented any statement of a doubt as to where that lot was. The owner claimed that the old map and deed “was a warrantee that his lot was to have the benefit of fronting on each side on a street,” andvcalled on the corporation to make good their undertaking. The committee could not deny that the owners were entitled to require a settlement of the boundary lines, and.a fulfillment of their rights in respect to fronting on streets so as to place them in as good a situation at least “as they would have been in, if the streets laid out by the survey of 1796 had not been abolished.” In Mr. Woolley’s case, the committee reported that when the lines of the piece of land known on the map of common land by the number 143, “ shall have been adjusted according to the present streets,” it “will constitute the block bounded by Seventy-eighth and Seventy-ninth-streets and the Fourth-avenue. This “adjustment of boundaries” was in fact an exchange of definite pieces of land, for the committee report that in order to adjust the lines of *194 the first mentioned piece, it will be necessary to convey to Mr. Woolley a strip of land on the northerly side of his lot, running from the Fourth.to the Fifth-avenue, and being fifty-seven feet five inches on the Fourth, and sixty feet wide on the Fifth-avenue, the said strip being part of the old street, and to receive from Mr. Woolley a conveyance of a strip of land forming a part of Seventy-eighth-street, and being fifty-five feet wide on the Fourth, and fifty-five feet seven" inches wide on the Fifth-avenue. But the last strip was more valuable than the first, to the amount of one hundred and twenty-five dollars, and the city had also been assessed on it, and had paid four hundred and thirty-four dollars. These sums the committee reported Woolley should pay to effect the “adjustment of boundaries.”
So far. as the defendants depend upon proof, direct or circumstantial, that an agreement was made and accepted, they cannot demand any better result than would follow the acceptance and consummation of what they proposed to be done.
We now assume that the conveyance had been delivered as the defendant proposed. This would constitute the only adjustment of boundaries there was in the minds of the parties. The property of each would remain where and what it was before the adjustment of boundaries, except so far as that adjustment made a change.
Woolley would have lost no other land than that to be described in the conveyance he was required to make. That would not have comprised any part of the old street on the south, or any part of the land in question. The reports of the committees treat the old streets as closed. E'er is there any description contained in the reports which would carry the north half of the street, attached to the land to be conveyed.
We will however see, if the evidence was conclusive that Woolley had accepted the proposal or acted upon *195 it, so as to be deemed to assent to it. We leave aside the specific rules that regard the transfer of real property.
Woolley had not himself asked for any particular mode of settling the difference. There is no direct evidence that he gave assent to the city’s plan. In September, 1836, he put his tenant in possession of land running to Seventy-ninth-street, and pointed out as his southern line the northern line of Seventy-eighth-street, and said the lot below belonged to the corporation. In October, 1836, he mortgaged land part of lot 143, bounded in the mortgage by Seventy-eighth and Seventy-ninth-streets. But this occurred before the city had taken its position, for the resolution to make the exchange with Woolley was not approved until February 22, 1837. There was therefore no concurrence betwen the two up to that time. After the resolution passed he made two mortgages, bounding the property mortgaged by Seventy-eighth and Seventy-ninth-streets, but his purpose in that may as well be referred to the considerations that moved him to do the like before the city had made its proposal, as to the proposal. At least it is not conclusive evidence of his having acted upon the city’s proposal.
There can be no stronger position for the defendant than that W oolley having (before he presented his petition) taken possession of that part of the land that the city afterwards proposed to convey to him, and the resolution proposing to convey that part to him, being made to accomplish what he wished, together with his remaining in possession after the resolution passed and the acts that it is alleged were done by the city as regards occupying the old road on the south, now claimed, prove that Woolley acceded to the city’s proposal.
This must be viewed from two positions, the one that the city and Woolley recognized the latter’s title to *196 half of the old streets, and the other that they did not. If they did not, then there was no intention or understanding that his title to that should be affected by the arrangement, and his acquiescence in the city’s adverse possession short of twenty years would not destroy his title.
On the other hand, if the title was in view at the time, Woolley’s retaining the city’s land cannot create a conclusive presumption that he acceded to an arrangement, which, if it deprived him of the land in question, would have been as inequitable and unjust as his retaining city land without compensation would have been to the city. The result would have been that the city would take this, strip in question twenty-five feet deep, and the strip on which in part Seventy-eighth-street was placed, fifty-six feet deep, depriving him of fee in either Seventy-eighth or Seventy-ninth-street, and convey to him thirty feet only, inasmuch as of the sixty feet strip they proposed to convey to him, .one half was already his own. There can be no rule of law, that his taking adverse possession of the land is conclusive proof that he meant to give up another piece of land without compensation, when the substantial justice of the arrangement did not call upon him to do this. If, in effect, the understanding was, that instead of the block between the old streets the owner should occupy and take a like block between the new streets, releasing what would be abandoned, to do justice it would be necessary that a right corresponding to the fee of the old street, or a compensation for it, should have accompanied the change. As to what was meant and understood, as indicated by the acts of the parties, it must be remembered that if Woolley took possession of thirty feet of the city’s property on Seventy-ninth-street the latter has not been asked for compensation for the fifty-five feet belonging to Woolley taken for Seventy-eighth-street. There is no evidence in the case *197 as to whether the city demanded or received from Woolley the sum the committee reported he should pay.
There can hardly be a doubt that the fact of Woolley’s ownership of a fee in the old roads, was not asserted or denied, or recognized by either party. The negotiations and understandings had no regard to it. It is not named even in the documents. The city assumes to own the south half of the old street on the north, by proposing to convey it, and had paid assessments upon it, while there is no demand that Woolley should convey his fee in the old street to the south. At that time the law on this subject, as regards streets only existing on maps, had not been definitely decided. From Woolley’s financial condition and other circumstances, I have no doubt that he did not know or think of it. This isolates the land from any agreement it may be supposed that the parties negotiated about or even acted on, and it must be looked at as if it had never been a part of lot 143. They made petitions and reports about lot 143, but they certainly meant only so much of it as was between the lines of the old streets, that is, two hundred feet of it. They treated of adjusting the boundaries, but they did not propose to alter one of the boundaries.
The facts in this case do not permit the defendants to claim that what the parties did, under the supposed or presumed understanding or agreement, involved as a fact the relinquishment of the strip in question, and that acquiescence in this condition of things short of twenty years is conclusive. One reason is sufficient, though several might be stated. The giving Woolley the whole block between Seventy-eighth and Seventy-ninth-streets would not, as a matter of fact, have involved necessarily his relinquishing a strip on the south side of Seventy-eighth-street. The most that can be claimed is, that it cannot be supposed that the city *198 would then have allowed Woolley'to remain in occupation of land np to Seventy-ninth-street, or that it would be Woolley’s duty to relinquish the land. In either casé, title to land is-not transferred.
I think the following are just conclusions in the case.
The evidence shows that down to 1833 nothing was done that affected the title to the land in question, after its conveyance by the city to David Wagstaff, in 1801.
There never has been any doubt or dispute'as to the rightful or actual boundaries of lot 143, or of the strip in question. The evidence does not conclusively show that the proposal made by the city was accepted or assented to by Woolley. At least there was such doubt about it that it was an issue for the jury. • Nor does the evidence show that the parties settled upon a boundary line of the premises in question. If the proposal of the common council had been acted upon, as made, that would not have affected the title to the premises in dispute. There has been no acquiescence by Woolley, in the settlement, by agreement or understanding of the parties, of any boundary line of the contested land. Neither the city nor Woolley at or during the negotiation forthe so-called i( adjustment of boundaries,” as matter of fact, believed that Woolley was owner of the fee of the .old streets in dispute, and no question as to it was made. This, however, upon the facts as they are now presented, would not be for a court but a jury to pass upon. On the case as now presented, if for any reason it is inferred that Woolley did not claim the land and the city did, the title of the former could pass only by adverse possession of the latter for twenty years. This last proposition is inevitable, if the law is, that unless the boundary is fairly disputed and an agreement be made as to it, possession and mutual acquiescence short of twenty years will1 not bar- a right of entry.
*199 To meet thé case, as it was substantially presented at the trial, it will be proper to determine whether the facts conclusively showed that, became at a time prior to the defendant’s obtaining a conveyance from the plaintiff, the defendant had had adverse possession for twenty years, the plaintiff’s former title had gone from him.
If evidence sufficiently shows the true title, it is not a material fact that the owner disclaimed title to the land. And here let us say, that Woolley’s meaning in declaring to his tenant that the north side of Seventy-eighth-street was the boundary of his line, presents something that a jury should pass upon. Several months after, the city recognized his title to land below that line, for they proposed that he should make a conveyance of a piece fifty-five feet deep, whose northern boundary was that line ; and when he spoke of the lot below, it is not certain that he meant to have regard to the strip in question. .
The law presumes that, where title is shown, the' true owner is in possession, until adverse possession is proved to begin. Adverse possession does not begin until an actual entry is made, accompanied by a Claim of title hostile to that of the true owner; and to bar a right of entry it must be continuous, for twenty years (Jackson v. Parker, 3 Johns. Ch. 124 ; La Frombois v. Jackson, 8 Cow. 589 ; Jackson v. Sellick, 8 Johns. 202; Jackson v. Sharp, 9 Id. 163; Humbert v. Trinity Church, 24 Wend. 587; Jackson v. Thomas, 16 Johns. 293).
In this case there is no evidence, down to 1841, when Allerton took possession of lot No. 140, that any one but the true owner was in actual possession of the land in question. Mr. Woodward’s petition, or the report on it, does not show that he was lessee of lot 140, nor for how long a time he had actual occupation, if at all. If Allerton did at that time take possession it does not *200 conclusively appear that his claim under the city lease to him was hostile to the true title, so far as this strip is concerned, and he left the land by 1853. What actual possession there was after that, except the owner’s, does not appear in the evidence until, in 1858, a tenant of the city took possession of a part of the land, and occupied it until 1866, when the city sold the fee of the whole of the land. This is enough so show that, on the facts as they stood, title was not barred by adverse possession. Of course, there are other pertinent considerations on this point, which are not now referred to.
I may here say, that nothing was shown on the trial to work an estoppel of Woolley to claim under his title. Even if he acquiesced, with full knowledge, in the city’s taking possession of the land, they came to no damage from that which made it inequitable that he should fake under his title (Jackson v. McConnell, 19 Wend. 177; Corning v. Troy Iron & Nail Factory, 44 N. Y. 577).
We have assumed the correctness of the decision of the learned judge, that Woolley’s title went to the center of the old roads. The counsel for plaintiff insists that that is not an open question, on this argument, which is heard only on the exceptions to decisions adverse to him. We will not pass upon that proposition, but agree with his honor that Bissell v. New York Central R. R. Co., 33 N. Y. 63, is authority for his ruling. The memorandum of the case of Terrett v. New York & Brooklyn Steam Sawmill & Lumber Co., 49 N. Y. 666, seems to support the same rule. Perrin v. New York Central R. R. Co., 36 N. Y. 130, clearly does.
The learned counsel for defendants argues a point that was not presented to the court below, arising upon the phraseology of the description in the deeds in the case. The deed bounds each side of the five acre lot *201 by a street sixty feet in breadth, lying “between” the lot granted and the lot on the north and on the south. The argument is, that such words separate and distinguish the lots from the streets, and the streets from the lots. It is fully supported by the citations of counsel from Codman v. Evans, 1 Allen. 443, and Chapman v. Edwards, 3 Id. 573. These cases say, that as the land is bounded on the creek, or the passage way “between” the land and other land, no part of the creek or passage way is conveyed. The land conveyed is external to the creek or passage way, for the latter would not wholly be between the two pieces of land, if half of it formed a part of the land conveyed. These cases ought not to affect the simple rule that should govern such a matter, and which is held to be the law of this State. Our law in substance is, that if the street, as an entirety, is stated to be the boundary, as distinguished from a side of it, the land goes to the center line of the boundary. The boundary is treated as if it were a line, but the parties take, according to the fact. Necessarily, any street, lane, fence or wall used as a boundary in a deed, must be between the land conveyed and the adjoining land. I cannot see that a statement in words, that the boundary is between the two, should have greater force than should the fact itself, of which these words are only descriptive.
The construction of deeds, on this point, has been influenced by considerations of public policy. This has affected judicial decisions in the different States (American note to Davaston v. Payne, 3 Smith L. Cas. 6 Am. ed. 338). In this State, Judge Oakley said, in Hammond v. McLachlan, that “principles of greatpublic convenience forbade that one should be the owner of a farm, and another of a road or stream running through it. The practical inconvenience of a contrary rule has led to this construction uniformly, unless where it expressly appears that the parties intended the con *202 trary,” and applied it to lots in a city bounded on a street. As the law stands, we should maintain the decision on this point made at the trial.
On the argument, the learned counsel for the defendant objected that the exception to the direction to find a verdict did not bring up on this appeal the subjects discussed, because the plaintiff on the trial did not request the court to submit any questions-of fact to the jury. Stone v. Flower, 47 N. Y. 566, settled that an exception to a direction to find a verdict for defendant brings up on the appeal the question whether, on any construction of the facts, the jury would have been warranted in finding for the plaintiff.
We think that the judge was correct in his ruling,that the other issues in the case, and which we have not referred to, should be submitted to the jury.
As we consider that the evidence in the case, as to the plaintiff’s title to the land, was not conclusive in favor of defendant, a new trial should .be had, the exceptions being sustained, and the verdict set aside, with costs to plaintiff, to abide the event of the action.
The order denying the motion for a new trial, on the ground of surprise and newly discovered evidence, should be affirmed. It is not necessary to go into particulars. The newly obtained facts were simply circumstances of the same kind with many that had been put in evidence. They were not in themselves decisive. Being in their nature cumulative, their discovery should not lead to a new trial. The facts of the same kind that were given in evidence were undisputed ; and if a court and jury would from them draw a conclusion, desired by the plaintiff, the additional-facts would have very little consideration. If such a conclusion would not be drawn, the additional facts would not lead to a different result. Of course, they had some weight, but not enough to require a new trial. The decision of the court did not involve.a surprise of *203 the plaintiff, as passing upon an issue not presented. I think the matter of the plaintiff’s title, and anything that transferred it, were folly within the issues.
The order appealed from should be affirmed, with costs.
Van Yoest and Speib, JJ., concurred.